**Affirmed and Opinion filed December 4, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-01037-CV

**THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER AND THE UNIVERSITY OF TEXAS SYSTEM, Appellants**

**V.**

**PRESTON BAKER & JENNIFER BAKER, INDIVIDUALLY AND AS NEXT FRIENDS OF PRESTON BAKER, JR., JESSICA BAKER, CAYLA BAKER AND CALEB BAKER, Appellees**

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2010-33587**

## O P I N I O N

Appellees Preston Baker, Jennifer Baker, and their four children sued The University of Texas M.D. Anderson Cancer Center (MDA), The University of Texas System (UTS), and The Proton Therapy Center-Houston Ltd., L.L.P. (PTC) for claims based on personal injuries sustained by the Baker children. MDA and UTS filed a plea to the jurisdiction contending that sovereign immunity had not been waived. The trial court

denied the plea, and MDA and UTS bring this interlocutory appeal. We affirm.

## BACKGROUND

The Bakers allege that Preston Baker was employed by MDA to use a milling machine to make bronze apertures by milling bronze plates, and in the course of using the milling machine, the machine emitted lead dust and contaminated his clothing. He wore his clothing home, where his family was also exposed to the lead dust, and his children suffered personal injuries.

MDA and UTS answered the Bakers' original and first amended petitions with special exceptions contending that MDA was "the proper defendant, and not [UTS]." Later, MDA and UTS filed a plea to the jurisdiction asserting sovereign immunity and attaching copies of the Bakers' first amended petition; the Bakers' response to MDA and UTS's earlier plea to the jurisdiction;[1] and interrogatory responses from Preston and Jennifer Baker. The trial court held a hearing on the plea to the jurisdiction. The court orally denied the special exceptions but delayed ruling on the plea. The Bakers then filed a second amended petition alleging in part as follows:

> PRESTON BAKER, Sr. has been employed by Defendant M.D. Anderson as a Machinist and Fabrication Technician in the Proton-Therapy Center (PTC) Machine Shop. Before Mr. Baker ever began working in the PTC Machine Shop, Defendants were aware of OSHA regulations generally, were aware of lead specific OSHA regulations, were aware that machinists such as Preston Baker, Sr. would potentially be exposed to lead in the process of making bronze apertures to shield patients from proton therapy beams, were aware of the need for monitoring to confirm exposure, were aware of the safety components required to eliminate or reduce exposures to employees, and were aware of the safety components required to eliminate exposures outside of the Machine Shop (take-home exposures).
>
> Responsibility for compliance with OSHA regulations and Defendants' internal programs and procedures was assigned to various employees of Defendants, such as Environmental Health & Safety (EH&S), Principle Investigators, Area Managers, the Respiratory Protection Program Administrator, the Building Manager, and the PTC Administrator. These

---

[1] The earlier plea is not relevant to the disposition of this appeal.

2

employees had a legal duty to provide the safety components that would eliminate or reduce lead exposures in the Machine Shop and eliminate exposures outside of the Machine Shop (take-home exposures). Because the employees of Defendants failed in their legal duty, Preston Baker, Sr. and other PTC workers were furnished tangible personal property lacking integral safety components and were required to use (misuse) tangible property, including motor driven equipment such as a milling machine, which created hazardous levels of toxic lead dust that left the Machine Shop on Mr. Baker's contaminated clothing. The Texas Department of State Health Services investigated the Baker family's elevated blood lead levels and found their home was not the source of exposure, that Mr. Baker's shoes and clothing were contaminated with lead, and traced the exposure to Mr. Baker's job for Defendants at the PTC. As a direct and proximate result of Defendants' negligence, Preston Baker unknowingly wore clothing contaminated with toxic lead dust home and his children were exposed to hazardous levels of toxic lead, developed elevated blood lead levels, which caused the injuries complained of in this action.

. . . .

. . . . Defendants were aware [of regulations that require] the 'employer shall assure that all protective clothing is removed at the completion of a work shift only in change rooms provided for that purpose,' and provide specific containers for the clothing 'which prevents dispersion of the lead outside the container.' Despite these requirements, a February 11, 2005 shop Safety Inspection Report noted that '[p]otential lead exposure monitoring was not conducted for the staff that cuts and mills lead. EH&S staff need to coordinate with shop personnel to complete this task.'

Defendant M.D. Anderson had on paper "Shop Safety Management Program" as of February 28, 2005. The program required, among other things, "hazard analysis," dust collection or exhaust systems in compliance with [OSHA regulations], and wearing appropriate protective equipment and attire.

. . . .

[T]he integral safety components required to prevent both PTC employee and take-home exposures was not provided. Instead, PTC workers, including Mr. Baker, were furnished tangible personal property lacking these integral safety components, and were required to use (or, in light of the lack of integral safety component, misuse) tangible personal property, including motor driven equipment such as a milling machine. . . . Toxic lead dust was generated when Mr. Baker and other Machine Shop workers used the tangible personal property provided by Defendants as intended and as they were instructed.

3

. . . . Employees were not using (not provided) appropriate personal protective equipment (PPE). There was no storage area for PPE and no ante-room 'where contaminated clothing can be discarded before leaving the work area.'

. . . .

PRESTON BAKER and JENNIFER BAKER do not in this action seek to recover for lead induced personal injuries to themselves. Their claims in this action arise out of and are related to the lead induced personal injuries of their children.

The trial court denied the plea to the jurisdiction, and MDA and UTS timely filed a notice of appeal from the interlocutory order. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2012).

## STANDARD OF REVIEW

If a governmental unit has immunity from suit, the trial court lacks subject matter jurisdiction. *Rusk State Hosp. v. Black*, No. 10-0548, — S.W.3d —, 2012 WL 3800218, at *5 (Tex. Aug. 31, 2012). Whether a court has subject matter jurisdiction is a question of law we review de novo. *Tex. Dep't of Wildlife v. Miranda*, 133 S.W.3d 217, 226, 228 (Tex. 2004). "When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Id.* at 226. "We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Id.*[2]

---

[2] If a plea to the jurisdiction challenges the existence of jurisdictional facts, "we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Miranda*, 133 S.W.3d at 227. If the evidence creates a fact question regarding the jurisdictional issue, then a plea to the jurisdiction should not be granted, and the fact issue must be resolved by the fact finder. *Id.* at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228. We take as true all evidence favorable to the plaintiff, and we indulge every reasonable inference and resolve any doubts in the plaintiff's favor. *Id.*

4

MDA and UTS contend that the trial court erred by denying the plea to the jurisdiction because the pleadings and evidence fail to establish a waiver of governmental immunity under the Texas Tort Claims Act (TTCA). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–101.109 (West 2011 & Supp. 2012). A governmental unit is immune from suit unless the TTCA expressly waives immunity. *Miranda*, 133 S.W.3d at 224–25. The TTCA waives immunity in three areas: "use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property." *Id.* at 225 (quotations omitted). Section 101.021 of the TTCA provides that immunity is waived for:

> personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2) (West 2011).[3] We address each of MDA and UTS's four issues below.

## I. Condition or Use of Tangible Personal Property that Proximately Causes Injuries

In their second and third issues, MDA and UTS contend the "pleadings and evidence conclusively establish" that (1) "no use of tangible personal property occurred"; (2) the injuries did not result from the "lack of an integral safety component of the milling machine"; and (3) the alleged injuries were not proximately caused by the condition or use of tangible personal property.

Initially, we note that MDA and UTS do not appear to challenge jurisdictional facts. They do not argue that any evidence attached to their plea would conclusively negate any factual allegations from the pleadings. Their arguments concern solely the

---

[3] Although Section 101.021 specifically addresses when a governmental unit is **liable** for damages, liability and immunity are coextensive under the TTCA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.025(a) (West 2011) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."); *see also Miranda*, 133 S.W.3d at 224; *Univ. of Tex. Health Sci. Ctr. v. Garcia*, 346 S.W.3d 220, 223 n.1 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

legal effect of the facts alleged in the petition and whether such allegations establish a waiver of governmental immunity. Accordingly, we must determine whether the Bakers have alleged facts that, when liberally construed, affirmatively demonstrate a waiver of MDA and UTS's governmental immunity.

### A.    Use of Tangible Personal Property; Lack of Integral Safety Component

The Bakers allege, *inter alia*, that MDA and UTS used tangible personal property: motor driven equipment such as a milling machine. The Bakers also allege a condition of tangible personal property that gives rise to a waiver of immunity because of a lack of integral safety components. We find that these allegations are each independently sufficient to state a waiver of sovereign immunity.

#### 1.    *Use of tangible personal property*

For governmental immunity to be waived, a plaintiff must allege an injury was caused by the use or condition of tangible personal property. *See id.* The Texas Supreme Court has "consistently defined 'use' to mean 'to put or bring into action or service; to employ for or apply to a given purpose.'" *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004) (citations omitted).

To provide a framework for analysis, we begin by examining circumstances that ***do not*** constitute use of tangible personal properly. First, merely "providing, furnishing, or allowing access to tangible property" generally does not constitute a "use" under the TTCA. *Black*, 2012 WL 3800218, at \*8. "Immunity is not waived when the governmental unit merely 'allow[s] someone else to use the property and nothing more.'" *Dallas Cnty. v. Posey*, 290 S.W.3d 869, 871 (Tex. 2009) (quoting *Cowan*, 128 S.W.3d at 246). So, when a governmental actor returned a hospital patient's suspenders and a walker to him after his involuntary commitment—which he subsequently used to commit suicide—the governmental actor did not use such property. *Cowan*, 128 S.W.3d at 246. And when a governmental actor allowed a hospital patient access to a plastic bag—which he subsequently used to commit suicide—the governmental actor did not use such

property.  *Black*, 2012 WL 3800218, at *8.

Second, the mere failure to use tangible personal property does not waive immunity.  *See Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996).  So, a governmental actor's failure to replace a corded telephone in a holding cell—which the decedent used to commit suicide—with a cordless telephone, did not constitute a use of tangible personal property.  *See Posey*, 290 S.W.3d at 871–72.  Similarly, allegations that faculty advisors at a university failed to adequately supervise the director and students in a play—who used a real knife instead of a fake one, resulting in a real stabbing—did not allege a use of tangible personal property.  *See Tex. A & M Univ. v. Bishop*, 156 S.W.3d 580 (Tex. 2005).

MDA and UTS contend that the Bakers' claims are couched in terms of "various failures . . . regarding the non-use of property" and that "the real substance of the Bakers' allegations focus on a non-use of property," for which there is no waiver of immunity. MDA and UTS focus on allegations that they failed to provide safety equipment such as protective clothing, failed to monitor employees for lead exposure, failed to follow OSHA regulations, or otherwise failed to prevent take-home exposures.  However, this case is not comparable to cases in which the plaintiffs claimed liability based on "non-use" of tangible personal property.

For example, in *Texas Natural Resources Conservation Commission v. White*, the plaintiff alleged that the governmental unit installed a motor driven pump on her property to dissipate gasoline vapors and then removed the pump, which allowed the vapors to return.  46 S.W.3d 864, 870 (Tex. 2001).  The Texas Supreme Court held that the plaintiff's actual claim was about the non-use of property, rather than the use of property, because she contended that the governmental unit should have continued to use the pump. *See id.*  Similarly, in *Kerrville State Hospital v. Clark*, a hospital patient murdered his wife after receiving an oral drug from the hospital.  923 S.W.2d at 585.  Relatives of the victim claimed that the hospital should have administered an injectionable drug rather than the oral drug because the hospital was aware that the patient was not taking his

7

medications and that he became violent when not medicated. *Id.* at 585; *id.* at 586 (Abbott, J., dissenting). The supreme court held that the "gravamen of their complaint is that [the hospital's] non-use of an injectionable drug was the cause of their daughter's death" because the plaintiffs did not allege that the oral drug caused any harm. *Id.* at 585 (majority op.). Immunity was not waived. *Id.* at 586.

The "various failures" of MDA and UTS in this case, as in many negligence cases, relate to the steps that a defendant might have taken to prevent the harm a plaintiff alleges directly resulted from the defendant's affirmative conduct.[4] Alleging "various failures" does not necessarily make this a "non-use" case over which the trial court would have no jurisdiction. *See City of Dallas v. Heard*, 252 S.W.3d 98, 107–08 & n.7, 110 (Tex. App.—Dallas 2008, pet. denied) (city zoo used property by exhibiting a gorilla despite allegations that the zoo failed to maintain surveillance cameras, failed to warn patrons of the escape, and failed to subdue the gorilla before it caused injury); *Retzlaff v. Tex. Dep't of Crim. Justice*, 135 S.W.3d 731, 738–39, 741 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (prison used property by placing razor wire along the perimeter fence even though an inmate injured by the razor wire alleged that the prison failed to warn him of the presence of the razor wire); *Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 222–23 (Tex. App.—Fort Worth 2003, pet. denied) (university used property when it provided ice in barrels to students although it failed to include a scoop for the ice, which contributed to the transmission of *E. coli* bacteria); *see also Doyal v. Tex. Dep't of Crim. Justice-Inst.-Div.*, 276 S.W.3d 530, 534–35 (Tex. App.—Waco 2008, no pet.) (prison used motor-driven equipment when a guard closed a cell door on an inmate's hand after failing to

---

[4] *See generally* RESTATEMENT (THIRD) OF TORTS § 3 cmt. a (2010) ("[T]his Section makes clear that negligence frequently involves the failure to take reasonable precaution. Thus, for example, a driver can be negligent for failing to step on the brakes when the driver's car approaches other traffic on the road. Such a failure can be described as an omission, and it hence can be said that the omission is itself negligent. Alternatively and preferably, it can be stated that the driver is negligent for the dangerous action of driving the car without taking the precaution of braking appropriately."); BLACK'S LAW DICTIONARY 1061 (8th ed. 2004) ("negligence, *n.* 1. The *failure* to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights." (emphasis added)).

8

give a verbal warning to the inmate and failing to wait for an "all clear" signal from another guard).

A simple example illustrates this point: a government employee, while driving a motor vehicle in the course and scope of employment, runs through a stop sign and collides with the plaintiff's vehicle.[5] There is no doubt the employee "used" the motor-driven vehicle even if the plaintiff alleges in her petition that the employee "failed" to stop at the intersection, "failed" to keep a proper lookout, "failed" to use the brakes, or "failed" to use corrective lenses.[6]

We recognize the difficulty of determining whether a claim is based on the use or condition of tangible personal property.[7] But we conclude that the gravamen of the Bakers' claim is that the governmental units' use of the milling machine caused injury to the Baker children. The Bakers allege that Preston Baker was a governmental employee and that he and other employees "were furnished tangible personal property"—a milling machine—and the employees "were required to use" the milling machine to make bronze apertures. The Bakers allege that employees used the machine "as intended and as they were instructed."

Thus, the Bakers' allegations sufficiently describe a use of tangible personal property. The milling machine was put or brought into action or service; it was employed for or applied to a given purpose—to make bronze apertures.

---

[5] Although a separate subsection of Section 101.021 waives immunity for injuries arising from the "operation or use" of motor-driven vehicles, the Texas Supreme Court has adopted the same definition of "use" for both subsections. *Compare Cowan*, 128 S.W.3d at 246 (tangible personal property), *with Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003) (motor-driven vehicle).

[6] *Cf. Kolster v. City of El Paso*, 972 S.W.2d 58, 59 (Tex. 1998) (city liable when its employee negligently failed to wear corrective lenses while driving); *Harris Cnty. v. Gibbons*, 150 S.W.3d 877, 886 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (no governmental immunity when a peace officer driving a patrol car rear-ended the plaintiff; liability was based on the officer's "actions in failing to maintain a proper lookout and to keep a proper distance" from the plaintiff's vehicle). *See generally* RESTATEMENT (THIRD) OF TORTS § 3 cmt. a.

[7] *See generally, e.g.*, *Tex. Dept. of Crim. Justice v. Miller*, 51 S.W.3d 583, 589–93 (Tex. 2001) (Hecht, J., concurring) (suggesting the court should abolish common law tort immunity because the statutory waiver is "unreasonable, arbitrary, or capricious [and] cannot be understood and consistently applied").

## 2. Condition of tangible personal property

A governmental unit may also be liable if it provides property that has "an inherently dangerous condition [that] poses a hazard when the property is put to its intended and ordinary use." *Black*, 2012 WL 3800218, at *9 (citing *Posey*, 290 S.W.3d at 872). Liability under this theory is rare and limited to circumstances when the furnished property "lacks an integral safety component." *See Clark*, 923 S.W.2d at 585 ("These cases represent perhaps the outer bounds of what we have defined as use of tangible personal property.").[8] Moreover, this theory does not apply to the failure to provide a *more effective* safety feature; the safety component must be lacking. *See Bishop*, 156 S.W.3d at 584.

For example, the supreme court has held that a governmental unit used property when: a college football coach provided a student with a uniform that lacked a knee brace, *see Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297 (Tex. 1976); government employees provided swimming attire without a life preserver to an epileptic patient, *see Robinson v. Cent. Tex. MHMR Ctr.*, 780 S.W.2d 169 (Tex. 1989); and a hospital provided a bed without rails to a patient, *see Overton Mem. Hosp. v. McGuire*, 518 S.W.2d 528 (Tex. 1975).[9]

As limited as this theory of waiver is, the Bakers' pleadings place the milling machine squarely within existing case authority and, thus, establish a waiver of immunity by the condition of tangible personal property. The allegations describe a dangerous condition of the milling machine completely lacking integral safety components, such as

---

[8] *See also Tex. State Tech. Coll. v. Beavers*, 218 S.W.3d 258, 267 (Tex. App.—Texarkana 2007, no pet.) ("[W]hen a governmental unit does more than merely allow another access to personal property, but also negligently equips the property, intentionally puts it into service for use by another with full knowledge of its intended use, and instructs the manner of its use, and when the personal property so supplied is in fact used in the manner and for the purpose the governmental unit intended and such use of the tangible personal property is a proximate cause of injury, the governmental unit has used tangible personal property in such a manner as to waive immunity under the Tort Claims Act.").

[9] Although these cases discuss the "use" of property, they may be better understood as "condition" cases. *See Beavers*, 218 S.W.3d at 264 n.1; *see also Black*, 2012 WL 3800218, at *8–9 (discussing "lack of integral safety component" cases in the context of the plaintiffs' "condition" argument).

an exhaust system. The governmental units did not merely furnish, provide, or allow access to the milling machine; MDA employed people to use a machine that, in the course of its ordinary and intended operation, created a hazard in the form of lead dust. *Cf. Harvey*, 124 S.W.3d at 222–23 (university waived immunity by providing students with barrels of ice lacking an ice scoop, which was an integral safety component).

Having determined that the Bakers' pleadings allege a use or condition of tangible personal property, we turn to MDA and UTS's argument that the Bakers have not alleged proximate cause.

### B. Proximate Cause

"Section 101.021(2) requires that for immunity to be waived, personal injury or death must be ***proximately caused*** by the condition or use of tangible property." *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998) (emphasis added). The government's use of the property must do "more than furnish the condition that makes the injury possible." *Id.* "[T]here must be a direct and immediate relationship between the injury and the use of the property." *Univ. of Tex. Med. Branch Hosp. at Galveston v. Hardy*, 2 S.W.3d 607, 609 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). When a plaintiff alleges a defective condition, "there must be a nexus between the condition of the property and the injury," which requires "more than mere involvement of property." *Posey*, 290 S.W.3d at 872. "For a defective condition to be the basis for complaint, the defect must pose a hazard in the intended and ordinary use of the property." *Id.*

Courts of appeals, including this one, have relied on traditional notions of proximate cause—such as cause-in-fact and foreseeability—to determine whether immunity has been waived under the TTCA. *See Tex. Dept. of Transp. v. Olivares*, 316 S.W.3d 89, 103 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 807–08 (Tex. App.—Fort Worth 2008, no pet.); *City of Sugarland v. Ballard*, 174 S.W.3d 259, 267 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also Bossley*, 968 S.W.2d at 343 (citing *Union Pump Co. v. Allbritton*, 898

11

S.W.2d 773, 776 (Tex. 1995), a non-TTCA case concerning proximate cause).[10] These principles acknowledge that that "[t]here may be more than one proximate cause" of an injury. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

### 1. Cause-in-Fact

Cause-in-fact "requires that the allegedly negligent act or omission constitute 'a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.'" *Olivares*, 316 S.W.3d at 103 (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008)). A defendant's negligence is not a substantial factor if the negligence "does no more than furnish a condition which makes the injuries possible." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004); *see also Union Pump*, 898 S.W.2d at 776, *cited in Bossley*, 968 S.W.2d at 343. "In other words, the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." *Mason*, 143 S.W.3d at 799. However, the defendant's conduct is a substantial factor if a reasonable person would "'regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility.'" *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)).[11]

MDA and UTS contend that cause-in-fact is absent here because:

(1) "the milling machine did nothing more than furnish the condition that made the alleged injury possible";

(2) "[t]he lead dust merely created a condition that later allegedly caused injury to the Baker children";

---

[10] *But see Bossley*, 968 S.W.2d at 345 (Abbott, J., dissenting) ("[T]he Court's analysis ignores the traditional proximate cause elements of cause in fact and foreseeability.").

[11] The "popular sense" is distinguished from the "'philosophic sense, which includes every one of the great number of events without which any happening would not have occurred.'" *Lear Siegler*, 819 S.W.2d at 472 (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a).

12

(3) "any allegation that the lead dust allegedly created in the PTC made its way to the Baker home is too attenuated and distant geographically, temporally, and causally";

(4) "while the use of the milling machine at the PTC may have created the lead dust in question, the use and condition of the milling machine were too attenuated from whatever exposure might have occurred in the Baker home"; and

(5) "[t]he source of the lead dust is of no consequence."

MDA and UTS analogize this case to *Bossley*, in which a suicidal patient at a mental health center escaped the facility through unlocked doors and leapt in front of a truck. 968 S.W.2d at 343. The plaintiffs complained of the use of tangible personal property (a governmental actor unlocking outer doors) and of the condition of property (unlocked inner doors). The supreme court rejected the argument, holding that "[t]he unlocked doors permitted [the patient's] escape but did not cause his death." *Id.* The court held that the unlocked doors did no more than furnish a condition that made the injury possible, and the use and condition of the doors were too attenuated from the patient's death to have caused it. *Id.*

The use of the milling machine, however, did far more than merely permit injury to the Baker children or furnish a condition that made their injuries possible. The Bakers allege that the use of the milling machine created lead dust, and unbeknownst to Preston Baker, the dust remained on his clothing when he went home, where his children were "exposed to hazardous levels of toxic lead [and] developed elevated blood lead levels." If the Bakers had alleged that because the milling machine broke down, Preston Baker left work early, picked the children up from school, and they were injured in a car wreck on the way home, then *Bossley* would be analogous. A more analogous case is *Robinson v. Central Texas MHMR Center* because the swim attire without life preserver did not kill the epileptic patient—the water killed the patient when he drowned. *See* 780 S.W.2d 169. Here, the milling machine is not in the Baker children's blood making them sick; rather, the lead dust emitted by the machine is alleged to be in their blood. The tangible personal property in each case is the "instrumentality of the harm." *See Robinson v.*

13

*Univ. of Tex. Med. Branch at Galveston*, 171 S.W.3d 365, 369 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And importantly, the Bakers specifically allege that the lead dust can be traced directly and immediately to the use of the milling machine. Thus, a reasonable person could view the use of the milling machine, which emitted lead dust when operated in its intended and ordinary function, as a cause of the injuries suffered by the Baker children.

### 2. Foreseeability

"Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others." *Olivares*, 316 S.W.3d at 103 (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)). Sometimes a defendant's conduct is not a proximate cause of the plaintiff's injuries because subsequent conduct of a third party interrupts or "supersedes" the defendant's negligence. *See generally Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450–52 (Tex. 2006) (plurality op.). If the act or omission alleged to be a superseding cause should have been anticipated at the time of the defendant's negligence, then there is no superseding cause—only a "concurrent" cause, which does not break the causal nexus. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009); *Dew*, 208 S.W.3d at 452 (citing *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968)). This legal principle bears repeating: an "intervening" cause that is foreseen or foreseeable does not break the causal chain. A true superseding cause is one that "alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly negligent act or omission." *Hawley*, 284 S.W.3d at 857 (citing *Dew*, 208 S.W.3d at 451).[12]

---

[12] We also look to the Restatement (Second) of Torts for guidance and consider the following factors:

> (a) the fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal

MDA and UTS argue that (1) "Preston Baker was the intervening cause as he allegedly carried the lead dust to his home;" (2) "the dust is not inherently harmful without an additional overt action, such as the administration of the dust to the children, resulting in the ingestion or inhalation of such dust;" (3) "[w]hatever actions, if any, that caused the contact between the Baker children and lead dust outside the PTC was not the result of any intended and ordinary use of the lead dust by UTS/MDA;" (4) "[t]he exposure occurred outside the PTC, and UTS/MDA cannot control activities taking place somewhere other than the PTC, e.g., the Baker home;" and (5) "[i]f Preston Baker had kept his allegedly contaminated clothing away from his children, the alleged exposure would not have occurred."

For purposes of causation, these contentions are unavailing. The Bakers have alleged that take-home exposure to lead was foreseeable to MDA and UTS (because of the OSHA regulations pertaining to lead); and the Bakers have alleged that the hazard was actually *foreseen* by MDA and UTS (as evidenced by their policies and procedures and compliance with OSHA regulations).[13] As emphasized above, "[a]n intervening cause reasonably foreseeable by the defendant, is not such a new and independent cause as to break the chain of causation between the defendant's negligence and the injury complained of to the extent of relieving the defendant of liability for such injury." *Teer*

---

in view of the circumstances existing at the time of its operation; (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Hawley*, 284 S.W.3d at 857–58 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

[13] We conclude that this level of specificity in the pleading of contemporaneous knowledge of the hazards of take-home exposure to lead markedly distinguishes this case from other Texas cases analyzing the foreseeability of injuries to third parties from take-home or secondary asbestos exposure. *See Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 461 (Tex. App.—Dallas 2007, pet denied) (holding that no duty arose from a 1948 memo collaterally mentioning an employee procedure to wash after working with "chemical products"; the risk of take-home exposure injury from asbestos was not generally known at the time of the defendant's alleged negligence in the 1950s).

*v. J. Weingarten, Inc.*, 426 S.W.2d 610, 614 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.).

The Bakers' pleadings sufficiently allege facts that allow us to conclude the intervening causes were reasonably foreseeable and did not break the chain of causation from the original negligence alleged. The Bakers allege that MDA and UTS "were aware that machinists such as Preston Baker, Sr. would potentially be exposed to lead in the process of making bronze apertures . . . and were aware of the safety components required to eliminate exposures outside of the Machine Shop (take-home exposures)." The Bakers allege that Preston Baker was "required to use" the milling machine, "which created hazardous levels of toxic lead dust that left the Machine Shop on Mr. Baker's contaminated clothing." They allege that MDA and UTS did not provide workers with means for eliminating take-home exposures, and as a result, "Preston Baker unknowingly wore clothing contaminated with toxic lead dust home and his children were exposed to hazardous levels of toxic lead."

MDA and UTS should have anticipated that Preston Baker would go home after work. His decision to go home while wearing his clothes did not alter the natural sequence of events or produce results that would not otherwise have occurred. The children's exposure to toxic lead dust was entirely dependent upon, and brought into operation by, the use of the milling machine and the alleged wrongful conduct of MDA and UTS.

The harm allegedly suffered by the Baker children is the same type of harm created by the use of the milling machine to make bronze apertures—inhalation or ingestion of lead dust.[14] Preston Baker's conduct of returning home with clothing that he

---

[14] We note that the Bakers supplied evidence from MDA's own "Shop Safety Inspection Program Report," dated February 11, 2005, which stated, "Potential lead exposure monitoring was not conducted for the staff that cuts and mills lead. EH&S staff need to coordinate with shop personnel to complete this task." And following an investigation of the Bakers' complaints, the Texas Department of State Health Services made suggestions to MDA as follows: "Notify former employees of the M&F Shop that they may have been exposed to lead, provide or direct them to education materials on the hazards and adverse effects of lead and recommend blood lead testing of themselves and children in their home."

16

did not know was contaminated with toxic lead dust is ordinary, normal, and entirely dependent upon the situation created by MDA and UTS's alleged negligence. He unwittingly exposed his children to the lead dust; MDA and UTS have not identified any of his conduct that was negligent or wrongful itself.

Again, the Bakers allege facts that are radically different from the authority relied upon by Appellants. In *Bossley*, the patient's injuries were self-inflicted and intentional. *See* 968 S.W.2d at 343. Similarly, the supreme court in *Posey* found "no causal nexus between the condition" of the corded telephone and an arrestee's use of the phone to hang himself because the condition of the phone did not "pose a hazard in the intended and ordinary use of the property." 290 S.W.3d at 872. Here, the Bakers allege that the milling machine contaminated his clothing with lead dust while the machine was being used for its intended purpose. Thus, injury to the Baker children resulted from the intended and ordinary use of the milling machine. MDA and UTS should have anticipated the dangers their alleged conduct created for others.

MDA and UTS's second and third issues are overruled.

## II.     Duty and Breach

In their fourth issue, MDA and UTS contend that the Bakers "have not alleged and cannot establish" a cause of action sufficient to waive immunity because (1) MDA and UTS owed no duty to the Baker children; and (2) no duty was breached.

### A.     Duty

MDA and UTS contend that they owed no legal duty to the Baker children "because Preston Baker was not an employee in the course and scope of his employment with [MDA] at the time of the alleged exposure to the Baker children." Citing Section 101.021(1) of the TTCA, they argue, "For a governmental unit to be liable for the negligence of its employee, the plaintiff must establish that the person who was negligent was an employee of the governmental unit and was acting in the scope of employment when the negligence occurred." (emphasis omitted). The Bakers do not assert liability

based on negligent conduct of Preston Baker occurring at his home while outside the course and scope of employment. Rather, viewing their pleadings with the appropriate level of deference, the Bakers allege negligence based on conduct by various governmental employees occurring within the course and scope of employment—furnishing a milling machine lacking integral safety components and using that machine as required for its intended purpose, which emitted toxic lead dust.[15]

To accept MDA and UTS's argument would require that a negligent employee continue to act in the course and scope of employment throughout the entire causal chain of events after his or her negligence. That is not the standard for respondeat superior. The general rule for respondeat superior requires, as MDA and UTS acknowledge, that the employee be acting in the course and scope of employment ***when the negligence occurs***. *See, e.g.*, *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). The Bakers need not allege that MDA and UTS employees were acting in the course and scope of employment when the ***injuries*** arose any more than the plaintiff in *Lowe* would need to allege that the football coach was acting in the course and scope of employment at the time the student was injured; or that the governmental employees in *Robinson* were acting in the course and scope of employment at the time that the patient drowned.

### B. Breach

MDA and UTS contend that they did not breach a duty of ordinary care because (1) they instructed "Preston Baker to operate the milling machine for its intended and ordinary purpose of milling bronze plates"; (2) "Preston Baker was not instructed to operate the milling machine in a way that would harm the Baker children and the children were never present at the PTC"; and (3) "Preston Baker . . . was not required to carry the

---

[15] The Bakers also respond that Section 101.021(1), which specifically includes a requirement that the employee was "acting within his scope of employment," is not included in Section 101.021(2). MDA and UTS suggest that this requirement is implicit. *See generally DeWitt v. Harris Cnty.*, 904 S.W.2d 650 (Tex. 1995). We need not address this issue because the Baker's allegations are sufficient regardless.

lead dust home to his children."

The Bakers allege in their petition that MDA and UTS "were aware that machinists . . . would potentially be exposed to lead in the process of making bronze apertures [and] were aware of the safety components required to eliminate exposures outside of the Machine Shop (take-home exposures)"; but MDA and UTS nonetheless furnished equipment to Preston Baker and other machinists without integral safety components, such as protective clothing, and required employees to use the milling machine. These are sufficient allegations concerning MDA and UTS's breach of duty.

MDA and UTS's fourth issue is overruled.

## III.    Pleading or Proving Involvement of a UTS Employee

In their first issue, MDA and UTS contend that the Bakers "neither plead nor proved a UTS employee negligently used tangible personal property that caused the alleged injuries." MDA and UTS argue that the petition specifically identifies Preston Baker as an employee of MDA, not UTS, and the Bakers' interrogatory responses attached to its plea are consistent with this allegation.

The Bakers argue that MDA and UTS are actually attempting to appeal the denial of their special exceptions, which is not reviewable by interlocutory appeal. The Bakers note that this issue was not raised in their plea to the jurisdiction. The Bakers also argue that MDA and UTS have waived this issue by failing to cite any legal authority on appeal. But the Bakers conceded at the plea hearing, and reiterated on appeal, that they do not know if UTS has "exercised the sort of administrative control or involvement that would lead to liability." The Bakers suggest that they need additional discovery to determine if UTS is liable, and a determination as to UTS's liability "would be premature at this stage." At oral argument before this court, counsel for the Bakers was unable to identify any allegation in the pleadings concerning UTS's liability for purposes of waiving governmental immunity.

19

First, we decline to hold that MDA and UTS waived this issue due to inadequate briefing. *See Univ. of Houston v. Barth*, 313 S.W.3d 817 (Tex. 2010) (per curium) (governmental unit did not waive right to challenge sovereign immunity as a result of inadequate briefing in the court of appeals), *rev'g* 265 S.W.3d 607 (Tex. App.—Houston [1st Dist.] 2008). Additionally, because issues of governmental immunity may be raised for the first time on interlocutory appeal, MDA and UTS's failure to include this ground in their plea to the jurisdiction does not preclude them from raising the issue now. *See Black*, 2012 WL 3800218, at *1 (sovereign immunity may be raised for first time on interlocutory appeal from the trial court's ruling on a challenge to expert reports in a health care liability claim).

However, when a governmental unit advances a novel theory of immunity for the first time on appeal, and the plaintiffs do not adequately allege jurisdictional facts, then the case should be remanded for further proceedings unless the governmental unit shows one of three situations exists:

> (1) the [plaintiffs'] pleadings or the record conclusively negate jurisdiction; (2) the [plaintiffs] had a full and fair opportunity in the trial court to develop the record and amend their pleadings to show jurisdiction yet failed to do so; or (3) if the [plaintiffs] did not have such an opportunity, they cannot show jurisdiction even if the case is remanded to the trial court and they are given the opportunity to develop the record as to jurisdiction and amend their pleadings.

*Id.* at *10. The Bakers' second amended petition does not conclusively negate jurisdiction concerning UTS. Although MDA and UTS contend that the Bakers failed to engage in additional discovery after the plea hearing, it cannot be said that the Bakers had a "full and fair opportunity in the trial court to develop the record and amend their pleadings" when the trial court orally denied the special exception, and MDA and UTS raised this issue in the jurisdictional context for the first time on appeal—when discovery had already been stayed pending resolution of the appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(b).[16] Further, MDA and UTS failed to include in this record any

---

[16] Because the trial court denied the special exception, the Bakers had no reason to ask the trial

20

evidence concerning UTS's lack of involvement with the property underlying the Bakers' claims.

Given our conclusion above that the trial court has jurisdiction over the Bakers' claims against MDA, it is possible that the Bakers could amend their pleadings and allege adequate facts for a waiver of UTS's governmental immunity. Upon remand, the trial court may in its discretion allow discovery on the jurisdictional issue concerning UTS. *See Black*, 2012 WL 3800218, at *10; *Miranda*, 133 S.W.3d at 228–29; *see also City of Kemah v. Vela*, 149 S.W.3d 199, 205 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (no additional discovery is needed if the court can conclude from undisputed facts that governmental immunity has not been waived as a matter of law).

MDA and UTS's first issue is sustained.

## CONCLUSION

Having overruled MDA and UTS's second, third, and fourth issues, we affirm the trial court's order denying the plea to the jurisdiction and remand for further proceedings. Having sustained MDA and UTS's first issue, the Bakers are entitled to amend their pleadings to allege facts demonstrating UTS's waiver of sovereign immunity; if the Bakers cannot do so, UTS should be dismissed.

/s/     Sharon McCally
        Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[17]

---

court to permit jurisdictional discovery concerning UTS's involvement.

[17] Senior Justice Margaret Garner Mirabal sitting by assignment.